UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

TARA D. FORD, )
 )
       **Plaintiff,** )
 )
v. ) Case No. 15-CV-0268-CVE-FHM
 )
MEGAN J. BRENNAN, )
POSTMASTER GENERAL, )
 )
       **Defendant.** )

## OPINION AND ORDER

Now before the Court is defendant's motion for summary judgment (Dkt. # 43). Defendant asks the Court to grant summary judgment in her favor, arguing that plaintiff fails to establish a prima facie case of race discrimination, sex discrimination, or retaliation, or in the alternative, that plaintiff fails to demonstrate pretext with respect to her retaliation claim. Id. Plaintiff responds that there are genuine disputes of material fact as to whether plaintiff can establish a prima facie case of sex discrimination and retaliation, and that there is sufficient evidence to allow a reasonable inference of pretext as to retaliation. Dkt. # 45.[1] Plaintiff's response is silent as to defendant's arguments regarding the race discrimination claim. Defendant has filed a reply. Dkt. # 48.

---

[1]     The Court cites Dkt. # 45 as plaintiff's response to defendant's motion for summary judgment. The Court has reviewed plaintiff's original response (Dkt. # 45) and the numerous errata plaintiff filed (Dkt. ## 46, 47), which do not alter substantively plaintiff's response. For the sake of clarity, the Court cites plaintiff's original response (Dkt. # 45) only.

**I.**

Plaintiff, an African-American female, served as a postal support employee (PSE) with the United States Post Service (USPS) during the time relevant to this action.[2]  Dkt. # 43, at 7;  Dkt. # 45, at 13.[3]  A PSE is a temporary, non-career employee with no benefits.  Dkt. # 43, at 7; Dkt. # 45, at 13.  Plaintiff was primarily assigned to the Northeast Station in Tulsa, Oklahoma, but had worked at various different stations, including the Downtown Post Office Station. Dkt. # 43, at 7-8; Dkt. # 45, at 13-14.  Plaintiff was "window qualified," meaning that she was qualified to work at the front window, or retail lobby area, of a post office.  Dkt. # 43, at 8; Dkt. # 45, at 13.  Plaintiff's supervisor at the Northeast Station was Lilly Kimrey.  Dkt. # 43, at 8; Dkt. # 45, at 14.  Prior to plaintiff's May 16, 2014 complaint, there was no record of complaints to any of Kimrey's superiors about Kimrey's behavior.  Dkt. # 43, at 8; Dkt. # 45, at 14.  The USPS has an anti-discrimination policy and procedures it uses to prevent workplace discrimination, including discrimination on the basis of race and sex.  Dkt. # 43, at 9; Dkt. # 45, at 15.

On May 12, 2014, plaintiff and Kimrey were working at the Northeast Station when Kimrey allegedly "slapped" plaintiff on her "butt."  Dkt. # 43, at 8; Dkt. # 45, at 15. At the time, plaintiff did not make any complaint about this incident to anyone at USPS, including Kimrey.  Dkt. # 43, at 8; Dkt. # 45, at 15.  Plaintiff worked the remainder of her shift that day.  Dkt. # 43, at 9; Dkt. #

---

[2]  Plaintiff remains employed with the USPS, but in the time since the events giving rise to this action, plaintiff has been promoted to permanent employee with increased pay and benefits. Dkt. # 43 at 15; Dkt. # 45, at 19.

[3]  In her response, plaintiff contends that many of defendant's undisputed facts are actually disputed. However, in some instances, plaintiff's denials of defendant's undisputed facts are non-responsive to the asserted fact, and in other instances, plaintiff responds with an argument or legal conclusion. In such situations, the facts which defendant asserts are undisputed are deemed admitted to the extent that they are supported by the record.

2

45, at 15. On May 16, 2014, at about 5:30 a.m., while working at the Northeast Station, plaintiff alleges that Kimrey "rubbed [her fingers] up the side of [plaintiff's] butt." Dkt. # 43, at 9; Dkt. # 45, at 16.  Plaintiff did not make any complaint about this incident to anyone at USPS, including Kimrey. Dkt. # 43, at 9; Dkt. # 45, at 16. At about 6:00 a.m., while working with another USPS employee in the "red room"--a secure room where valuable mail matter and contents are kept--plaintiff alleges that Kimrey tried to hug plaintiff. Dkt. # 43, at 10; Dkt. # 45, at 16. Plaintiff alleges that, as plaintiff turned to walk away, Kimrey "stuck her hand between [plaintiff's] legs and groped up." Dkt. # 43, at 10; Dkt. # 45, at 16. Plaintiff stated to Kimrey, "Lilly, you cannot do that," to which Kimrey responded, "I can't? . . . Well, the boys let me do it." Dkt. # 43, at 10; Dkt. # 45, at 16. Plaintiff told Kimrey that "[she was] not the boys." Dkt. # 43, at 10; Dkt. # 45, at 16. Plaintiff worked the remainder of her shift that day and no additional incidents with Kimrey occurred. Dkt. # 43, at 10; Dkt. # 45, at 17. Two Caucasian males who also worked at the Northeast Station under the supervision of Kimrey, Michael Wilson and Johnny Lee, were also subject to physical contact by Kimrey during their employment. Dkt. # 43, at 9; Dkt. # 45, at 15. Wilson stated that Kimrey was "handsy" with him, but also stated that he did not complain to anyone at the USPS about the physical contact and did not ask Kimrey to stop. Dkt. # 43, at 9; Dkt. # 45, at 15. Plaintiff stated that she observed Kimrey on several occasions "hug" Lee "all over" while he was working on the workroom floor. Dkt. # 43, at 9; Dkt. # 45, at 15.

Sometime during the day on May 16, 2014, plaintiff contacted Charley Mose, her union president, to make a complaint about Kimrey's behavior. Dkt. # 43, at 11; Dkt. # 45, at 17. Plaintiff made a written statement recounting the incidents and Mose contacted the Tulsa Postmaster, Kathy Ervin-Johnson, with plaintiff's complaint. Dkt. # 43, at 11; Dkt. # 45, at 17. Plaintiff's handwritten

3

statement described Kimrey as having "stuck her hand between [plaintiff's] legs and rubbed up [plaintiff's] butt." Dkt. # 43, at 11; Dkt. # 45, at 17. In response to Mose's communication of plaintiff's complaint, Ervin-Johnson contacted USPS human resources to begin an investigation. Dkt. # 43, at 11; Dkt. # 45, at 13. Ervin-Johnson also met with Kimrey and told her she would be working at the Downtown Station until further notice. Dkt. # 43, at 11; Dkt. # 45, at 13. On May 19, 2014, Kimrey reported to work at the Downtown Station and worked there the entire week. Dkt. # 43, at 11; Dkt. # 45, at 13. From May 17, 2014 to May 22, 2014, plaintiff worked as scheduled at the Northeast Station without incident. Dkt. # 43, at 11; Dkt. # 45, at 17. The USPS investigation ultimately resulted in Kimrey receiving a demotion to a lower position with reduced pay based on her inappropriate behavior. Dkt. # 43, at 15; Dkt. # 45, at 19.

Andrew Jones, the Downtown Station manager, needed a "window qualified" clerk to work at the Downtown Station on May 23, 2014 due to a staffing shortage. Dkt. # 43, at 12; Dkt. # 45, at 17. Jones contacted plaintiff's manager at the Northeast Station, Lee, to inquire about plaintiff's availability to work at the Downtown Station on that date. Dkt. # 43, at 12; Dkt. # 45, at 13. Plaintiff had worked at the Downtown Station on several occasions, performing her work in a satisfactory manner. Dkt. # 43, at 12; Dkt. # 45, at 17. Lee informed Jones about the incident between plaintiff and Kimrey and the subsequent complaint and investigation. Dkt. # 43, at 12; Dkt. # 45, at 13. After this conversation, Lee told plaintiff to report to the Downtown Station on May 23, 2014 to fill a window shortage. Dkt. # 43, at 12; Dkt. # 45, at 17. On May 23, 2014, plaintiff reported to the Downtown Station at 7:30 a.m. Dkt. # 43, at 13; Dkt. # 45, at 13. Before beginning work, plaintiff met with Jones, but did not tell him that she did not want to work at the Downtown

Station if Kimrey were present.  Dkt. # 43, at 13; Dkt. # 45, at 13.  Plaintiff's shift was scheduled to end around 12:30 p.m.  Dkt. # 47, at 207.

Kimrey was not at the Downtown Station when plaintiff arrived.  Dkt. # 43, at 13; Dkt. # 45, at 13.  Kimrey arrived at the Downtown station at 11:00 a.m.  Dkt. # 43, at 13; Dkt. # 45, at 13.  Jones told Kimrey that plaintiff was working the window and that Kimrey should not have contact with plaintiff or go near the window under any circumstances.  Dkt. # 43, at 13; Dkt. # 45, at 13.  Kimrey remained at her assigned desk, which was roughly 105 feet away from the window and separated by a partition, the entire time that plaintiff was at the Downtown Station.  Dkt. # 43, at 13; Dkt. # 45, at 13.  Around 11:00 a.m. plaintiff heard a voice she believed belonged to Kimrey.  Dkt. # 45, at 14; Dkt. # 43, at 18.  Plaintiff also asserts that she was directed to take a piece of mail to a supervisor, which would have required her to interact with Kimrey, but acknowledges that she did not have to report to, directly interact with, or speak to Kimrey during her shift.  Dkt. # 45, at 12-13; Dkt. # 47, at 57.  Plaintiff became upset, filled out a leave slip with the help of another co-worker, and left.  Dkt. # 43, at 14; Dkt. # 45 at 18. Plaintiff did not tell anyone in management that she was upset, nor did she request that Kimrey be moved to another location.  Dkt. # 43, at 14; Dkt. # 45, at 18.  Plaintiff asserts that she was not "emotionally and physically capable of finding a manager during her nervous breakdown."  Dkt. # 45, at 18.

A few months later, plaintiff's manager at the Northeast Station, Lee, told plaintiff to report to another station, the Chimney Hills Post Office Station, for two days to work in the "red room."  Dkt. # 43, at 14; Dkt. # 45, at 18.  Plaintiff asserts that this assignment was an attempt to set her up for missing money and valuables.  Dkt. # 2, at 8.  Plaintiff informed Lee that she had a doctor's appointment with a specialist in Tahlequah on the day she was supposed to report to the Chimney

5

Hills Station.  Dkt. # 43, at 14; Dkt. # 45, at 18.  Plaintiff had not filled out a leave request for or advised management of the appointment before she mentioned it to Lee.  Dk. # 43, at 14; Dkt. # 45, at 18.  Lee advised plaintiff to discuss her appointment with the manager at Chimney Hills.  Dkt. # 43, at 14; Dkt. # 45, at 18.  Plaintiff discussed her scheduled doctor's appointment with Chimney Hills manager, who advised plaintiff that she should not report to work at the Chimney Hills Station, and should instead attend her doctor's appointment.  Dkt. # 43, at 14; Dkt. # 45, at 18.  Plaintiff did not work at the Chimney Hills Station and did not miss her doctor's appointment.  Dkt. # 43, at 14; Dkt. # 45, at 18.

Having exhausted her administrative remedies, plaintiff filed this action, alleging sex and race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII).  Dkt. # 2.  Specifically, plaintiff asserts that Kimrey's behavior and unwanted touching constituted disparate treatment race and sex discrimination and quid pro quo sex discrimination and argues that her transfer to the Downtown Station and Chimney Hills was a retaliatory response to her complaint about Kimrey's behavior.  Id.  Defendant now moves for summary judgment, arguing that plaintiff fails to establish a prima facie case of discrimination or retaliation, and fails to demonstrate pretext with respect to plaintiff's retaliation claim.  Dkt. # 43.

**II.**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Id. at 327 (quoting FED. R. CIV. P. 1).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law." Id. at 251-52. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). Plaintiff asserts claims of race and sex discrimination and retaliation in violation of Title VII. As plaintiff presents no direct evidence of discrimination

or retaliation, plaintiff's claims are subject to the McDonnell Douglas[4] burden-shifting framework.

See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000).

> Under the McDonnell Douglas framework, the plaintiff must carry the initial burden under the statute of establishing a prima facie case of . . . discrimination. Once the plaintiff has established a prima facie case, [t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for its employment action. If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual.

Id. at 1226 (alteration in original) (internal quotation marks and citations omitted).

**A.**

Defendant asserts that plaintiff fails to make a prima facie case of sex or race discrimination, arguing that plaintiff identifies no adverse employment action and that the circumstances do not give rise to an inference of discrimination. Dkt. # 43, at 17. With respect to defendant's arguments about plaintiff's sex discrimination claim, plaintiff responds that she has sufficiently shown an adverse employment action, including a "malicious transfer" to the same location where plaintiff's former supervisor had been reassigned, and asserts that the circumstances give rise to an inference of discrimination. Dkt. # 45, at 23. Plaintiff's response is silent as to defendant's arguments regarding plaintiff's race discrimination claim.[5] See id.

A prima facie case of disparate treatment discrimination requires a plaintiff to show: (1) that the victim belongs to a protected class; (2) that the victim suffered an adverse employment action;

---

[4]  McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973).

[5]  Defendant asserts that plaintiff's failure to respond to defendant's argument that she is entitled to summary judgment on plaintiff's race discrimination claim should be deemed acquiescence. Dkt. # 48, at 8. Although plaintiff does not respond to defendant's arguments about her race discrimination claims, plaintiff does not expressly state her intent to abandon these claims. As such, the Court considers the merits of defendant's argument.

and (3) that the challenged action took place under circumstances giving rise to discrimination. EEOC v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007). Plaintiff alleges that she was sexually harassed by Kimrey because of her race and sex. Plaintiff satisfies the first element of a disparate treatment discrimination claim as an African-American female. But plaintiff fails to demonstrate either that she suffered an adverse employment action or that the challenged action took place under circumstances giving rise to discrimination.

First, plaintiff fails to demonstrate that she suffered an adverse employment action. The Tenth Circuit liberally defines the term "adverse employment action," and "[s]uch actions are not simply limited to monetary losses in the form of wages or benefits." Sanchez v. Denver Pub. Schs., 164 F.3d 527, 532 (10th Cir. 1998). "Conduct rises to the level of 'adverse employment action' when it 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decisions causing a significant change in benefits.'" Stinnet v. Safeway, Inc., 337 F.3d 1213, 1217 (10th Cir. 2003) (quoting Sanchez, 164 F.3d at 532). Actions that merely inconvenience an employee or alter the employee's job responsibilities are not considered adverse employment actions. Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir. 2007). A purely lateral transfer, even if involuntary, is not considered an adverse employment action if the employee receives the same salary and benefits and the employee's responsibilities are substantially similar. Sanchez, 164 F.3d at 532. An assignment to a new shift without any difference in pay or benefits is not an adverse employment action, even if some inconvenience results to the employee. Daniels v. Utd. Parcel Serv., Inc., 701 F.3d 620, 635 (10th Cir. 2012). In the context of employment discrimination claims, an involuntary transfer is not considered an adverse employment action unless it is accompanied by a loss of pay or benefits or

the significant alteration of an employee's duties. Vann v. Sw. Bell Tel. Co., 179 F. App'x 491, 497 (10th Cir. 2006) (unpublished).[6]

Plaintiff, in her response, identifies three purported adverse employment actions: (1) a "malicious transfer" to the Downtown Station; (2) a "nervous emotional breakdown requiring her early departure" from the Downtown Station; and (3) "missed wages resulting from her early departure." Dkt. # 45, at 22-23. Quite simply, none of these events constitutes an adverse employment action for the purposes of a Title VII discrimination claim. First, plaintiff's assignment to work one shift a the Downtown Station does not constitute an adverse employment action. Although plaintiff identifies her shift re-assignment as a transfer, it was not permanent; plaintiff's manager assigned her to the Downtown Station for only a single shift. And there is no evidence that plaintiff's single-shift reassignment imposed any change in employment status or came with different salary or benefits. Further, plaintiff did not complete this single shift, but suffered no adverse consequences from leaving her post early.

To the extent that plaintiff asserts that her assignment to the Chimney Hills Station was also an adverse action, this argument similarly fails. See Dkt. # 2, at 8. For the same reasons that her temporary reassignment to the Downtown Station was not an adverse employment action, neither was her temporary assignment to the Chimney Hills Station. And plaintiff never worked a single shift at the Chimney Hills Station, having been instructed by the manager not to come in because she had a conflicting doctor's appointment. Plaintiff's "nervous emotional breakdown," while unfortunate, does not qualify as an adverse employment action because it is simply not an

---

[6]   This and other unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

10

employment action. Nor do plaintiff's missed wages from the time she took off after her "nervous emotional breakdown." Such missed wages do not constitute a significant change in plaintiff's employment status because, although plaintiff was not paid for the hours she did not work, this was not the result of any change in pay or other significant employment benefit.

Second, even if plaintiff were able to identify an adverse employment action, she fails to demonstrate that such an action took place under circumstances giving rise to an inference of discrimination. "One method by which a plaintiff can demonstrate an inference of discrimination is to who that the employer treated similarly situated employees more favorably." Luster v. Vilsack, 667 F.3d 1089, 1095 (10th Cir. 2011). Plaintiff provides no factual support for her assertions that she was sexually harassed or that any supposed adverse action occurred because of her race or sex. Instead, the record demonstrates that Kimrey behaved inappropriately with other employees who were not members of a protected class and that plaintiff's assignment to the Downtown Station for a single shift was based upon staffing needs and plaintiff's experience working the front window. Plaintiff herself concedes that when she told Kimrey not to touch her, Kimrey responded, "Why not? . . . The boys let me do it," clearly indicating that Kimrey's behavior was not limited to or targeted at women. And other evidence demonstrates that at least two men, Wilson and Lee, were subject to similar treatment by Kimrey. Similarly, no evidence in the record demonstrates that Kimrey's actions were racially motivated. Wilson and Lee are both Caucasian and plaintiff admits that she has no factual support for her belief that Kimrey targeted her for her race, other than the fact that plaintiff is "a black woman." Dkt. # 47, at 41. There is no evidence that any purported adverse employment action occurred under discriminatory circumstances. For these reasons, plaintiff fails to make a prima facie case of disparate treatment race or sex discrimination.

Plaintiff also asserts a claim under Title VII for sexual harassment. Title VII prohibits an employer from discriminating against an employee on the basis of sex "with respect to [her] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Workplace sexual harassment may take either of two forms: (1) "hostile work environment" harassment, which consists of offensive gender-based conduct that is severe or pervasive; or (2) "quid pro quo" harassment, which "occurs when submission to sexual conduct is made a condition of concrete employment benefits." Hicks v. Gates Rubber Co., 883 F.2d 1406, 1413 (10th Cir. 1987). Plaintiff advances a theory of quid pro quo sexual harassment.[7] The "gravamen of a quid pro quo sexual harassment claim is that tangible job benefits are conditioned on an employee's submission to conduct of a sexual nature and that adverse job consequences result from the employee's refusal to submit to the conduct." Id. at 1414. The relevant inquiry in a quid pro quo case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances. Karibian v. Columbia Univ., 14 F.3d 773, 778 (2d Cir. 1994) (finding quid quo pro

---

[7] "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher v. City of Boca Raton, 524 U.S. 775, 805-807 (1998). If the alleged harassment does not result in any tangible employment action being taken, an employer may raise a defense to a vicarious liability hostile work environment claim that the employee did not take advantage of the employer's preventative or remedial apparatus. Id. This is known as the Faragher-Ellerth defense. See Faragher, 524 U.S. at 775; Burlington Indus. v. Ellerth, 524 U.S. 742 (1998). But, this framework does not apply to quid pro quo sexual harassment claims. Quid pro quo sexual harassment claims are premised upon a tangible employment action conditioned upon the acceptance of sexual advances. Hicks v. Gates Rubber Co., 883 F.2d 1406, 1413 (10th Cir. 1987). Because, by their nature, quid pro quo sexual harassment claims require a tangible employment action, the Faragher-Ellerth defense is inapplicable. Defendant concedes that the Farager-Ellerth defense does not apply to plaintiff's claim, but asserts that evidence of a USPS anti-harassment policy and a quick response to plaintiff's complaint is relevant to plaintiff's retaliation claim because it helps demonstrate the lack of a discriminatory animus. Dkt. # 43, at 16 n.6.

harassment where plaintiff's supervisor made and threatened to make decision affecting the terms and conditions of her employment based upon her submission to his sexual advances). A plaintiff must show that an adverse employment action "resulted from" sexual harassment, which means that there must be a causal connection between the two. See Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 753-53 (1998) ("When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII.").

Plaintiff simply fails to identify any tangible job benefit that was conditioned on her acceptance of Kimrey's behavior. No evidence suggests that plaintiff's acceptance of Kimrey's unwanted advances and touching was connected to an adverse employment action. First, plaintiff herself acknowledges that neither Kimrey nor any other USPS employee made any statements or otherwise implied to plaintiff that acceptance of Kimrey's behavior was required for plaintiff to keep her job. Dkt. # 43-1, at 18. And the evidence demonstrates the opposite: plaintiff complained to Kimrey about her advances and Kimrey stopped; plaintiff complained to defendant and defendant conducted an investigation; defendant ultimately demoted Kimrey and reduced her salary; and plaintiff remains employed with defendant, having recently been promoted to a full-time, salaried employee. Second, as discussed with respect to plaintiff's disparate treatment sex and race discrimination claims, plaintiff fails to identify an adverse employment action that occurred because she rejected Kimrey's advances. And, even if plaintiff's could identify an adverse employment action, neither her assignment to serve at the Downtown Station for a single shift, nor her nervous breakdown and missed wages "resulted from" her refusal to submit to Kimrey's unwanted advances.

Plaintiff's transfer to the Downtown Station was based on a need at that station and plaintiff's qualification to work the front window. And plaintiff's manager at the Northeast Station notified the Downtown Station manager of plaintiff's complaint against Kimrey and advised that the two should not work together during plaintiff's shift. The evidence in the record simply does not support plaintiff's quid pro quo sexual harassment claim.

In sum, plaintiff fails to establish a prima facie case of sex or race discrimination. Plaintiff identifies no adverse employment action nor any causal connection that would support her discrimination claims. Defendant should thus be granted summary judgment on plaintiff's race and sex discrimination claims.

**B.**

Defendant next argues that she is entitled to summary judgment on plaintiff's retaliation claim, asserting that plaintiff fails to establish a prima facie case of retaliation or show pretext. Dkt. # 43, at 15. Plaintiff responds that there are genuine disputes of material fact as to whether plaintiff can establish a prima facie case of retaliation, and asserts that she has offered sufficient evidence demonstrating that defendant's proffered reason for the challenged action was pretextual. Dkt. # 45, at 26.

A prima facie case of retaliation requires a plaintiff to show: (1) she engaged in protected opposition to an unlawful employment practice; (2) she suffered an adverse employment action; and (3) there was a causal connection between the plaintiff's protected opposition and the adverse employment action. Zokari v. Gates, 561 F.3d 1076, 1081 (2009). Plaintiff satisfies the first element of a prima facie case of retaliation because her May 16, 2014 formal complaint about Kimrey's behavior constitutes protected opposition to an unlawful employment practice. But

plaintiff fails to demonstrate either that she suffered an adverse employment action or that a causal connection exists between plaintiff's complaints and any alleged adverse employment action.

First, plaintiff fails to establish that she suffered an adverse employment action. As discussed with respect to plaintiff's discrimination claims, the purported adverse employment actions plaintiff identifies in her response--a "malicious transfer," a "nervous emotional breakdown requiring her early departure," and "missed wages resulting from her early departure"--do not satisfy this element of a prima facie case. See supra III.A. And, as also previously discussed, plaintiff's assignment to the Chimney Hills Station does not qualify as an adverse employment action. See id. Second, even if plaintiff were able to identify an adverse employment action, no evidence suggests that it was causally related to her complaints about Kimrey's behavior. An employee may establish causation by showing that the adverse employment action occurred soon after the protected activity. Annett v. Univ. of Kan., 371 F.3d 1233, 1239-40 (10th Cir. 2004). Although plaintiff alleges that the purported adverse employment actions occurred a number of days after her complaint about Kimrey's behavior, the timing of these actions--seven days apart--coupled with the evidence that defendant temporarily reassigned plaintiff for one shift to the Downtown Station based on specific staffing needs, notified the Downtown Station manager about plaintiff's complaints about Kimrey's behavior, and advised Kimrey to stay away from plaintiff, demonstrate that no causal connection existed between the two.

Finally, even if plaintiff were able to establish a prima facie case of retaliation, she fails to demonstrate that defendant's proffered non-discriminatory reason for temporarily re-assigning her to other stations--that specific stations needed temporary service and plaintiff had experience in these service areas--was a pretext. "A showing of pretext does not require a plaintiff to offer any

15

direct evidence of actual discrimination." Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1113 (10th Cir. 2007). Rather, "[a]n employee may show pretext based on 'weakness, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief." Id. (quoting Morgan v. Hilti, 108 F.3d 1319, 1323 (10th Cir. 1997)).  Plaintiff has identified no evidence that would lend itself to a conclusion that defendant's reason for temporarily transferring plaintiff was a pretext and merely a guise to cover a discriminatory motive.  The evidence demonstrates that defendant had a staffing need at the Downtown Station, plaintiff was qualified to fill this position, plaintiff was assigned to a single shift, plaintiff's manager informed the Downtown Station manager of the situation between plaintiff and Kimrey, and the Downtown Station manager told Kimrey to stay at her station and away from plaintiff.  These facts demonstrate that defendant's non-discriminatory reason for temporarily assigning plaintiff to the Downtown Station was not a pretext for a retaliatory motive in response to plaintiff's formal complaint about Kimrey's behavior. Defendant's non-discriminatory explanation contains no weaknesses, implausibilities, inconsistencies, inchoherencies, or contradictions that would support a showing of pretext.  Plaintiff has thus failed to satisfy her burden of showing pretext.

Plaintiff has failed to establish a prima facie case of retaliation, or in the alternative, has failed to show that defendant's proffered non-discriminatory reason for reassigning plaintiff to the Downtown Station for a single shift was a pretext.  Defendant should thus be granted summary judgment on plaintiff's retaliation claim.

## IV.

In sum, the Court concludes defendant is entitled to summary judgment on plaintiff's race discrimination, sex discrimination, and retaliation claims because plaintiff has failed to establish a prima facie case, or as to plaintiff's retaliation claim, demonstrate pretext. The Court notes that federal anti-discrimination laws are designed to protect individuals from discrimination in the workplace based on immutable characteristics, but are not designed to provide plaintiffs a vehicle to pursue meritless federal claims based solely on a plaintiff's membership in a protected class. The Court evaluates all claims equally, but advises plaintiff that federal anti-discrimination claims should be based in fact and should not be merely an exercise in checking all the boxes of protected classes to which plaintiff may belong.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Dkt. # 43) is **granted**.

**IT IS FURTHER ORDERED** that defendant's motion in limine (Dkt. # 49) is **moot**.

**DATED** this 27th day of June, 2016.

*Claire V. Eagan*
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE